Strafford
No. 2003-307

## THE STATE OF NEW HAMPSHIRE

v.

## SHIRLEY ANN STERN

Argued: March 10, 2004
Opinion Issued: April 5, 2004

*Peter W. Heed*, attorney general (*Michael A. Delaney*, senior assistant attorney general, on the brief and orally), for the State.

*Jeffco, Starbranch & Soldati*, of Portsmouth (*Stephen T. Jeffco* and *Harry N. Starbranch, Jr.* on the brief, and *Mr. Jeffco* orally), for the defendant.

GALWAY, J. The defendant, Shirley Ann Stern, appeals her convictions by a jury for negligent homicide, *see* RSA 630:3 (Supp. 2003), and aggravated driving while intoxicated, *see* RSA 265:82-a (Supp. 2003), and her sentence on the negligent homicide charge. She argues that: (1) the Superior Court (*Fauver*, J.) erroneously denied her motion to suppress three blood samples; and (2) the Superior Court (*T. Nadeau*, J.) impermissibly amended her sentence to correct an error. We affirm.

The following facts were either found by the trial court or are evident from the record. On the evening of July 31, 2001, the defendant and her elderly mother were involved in a single vehicle accident on Bay Road in Durham. Durham Police Officers Gabe Tarrants and Frank Weeks and Detective Michael Bilodeau were dispatched to the scene at 9:39 p.m.

When the officers arrived, they found the defendant's vehicle lying on its passenger side facing north in the southbound lane. They saw no other vehicles on the road, no debris and no skid marks. The weather was clear. The defendant was tending to her mother whose arm was pinned underneath the vehicle. The defendant's mother appeared to be losing consciousness.

The defendant and her mother were extricated from the vehicle and taken to Exeter Hospital. Detective Bilodeau instructed Officer Weeks to obtain a blood sample from the defendant at the hospital. *See* RSA 265:93 (Supp. 2002) (amended 2003).

The defendant arrived at the hospital at approximately 10:00 p.m. Officer Weeks informed her that he was required to obtain a blood sample from her. *See id.* Before this blood sample was taken, Officer Weeks began questioning her about the accident. He noticed that her speech was thick-tongued and slurred, she frequently mumbled, and her breath smelled of alcohol. He also observed that she behaved erratically. As the officer testified at the suppression hearing:

> She kept constantly asking [about her mother]. I noticed her responses were varied. Sometimes when she talked to the doctor, she started crying and screaming. Sometimes she would stay quiet, think for a moment, then ask the question again. "What's going on with my mother?" She frequently just shouted out, "Why won't you tell me what's going on with my mother?" Sometimes she just spoke randomly to no one in particular.

At Officer Weeks' direction, hospital staff drew the first blood sample at 11:10 p.m. After this sample was drawn, Officer Weeks telephoned Deputy Chief Randy Kelly and informed him of his observations. Officer Weeks arrested the defendant for aggravated driving while intoxicated at 11:30 p.m. and obtained her consent for additional blood tests. *See* RSA 265:82-a.

Hospital staff drew a second blood sample from the defendant at 12:44 a.m. Sergeant Frank Daly, who had arrived at the emergency room to assist Officer Weeks, observed this. Sergeant Daly testified that he then called Deputy Chief Kelly to let him know "where [we] were in the process." He testified that he told Deputy Chief Kelly that he "felt that [the defendant] may have been drinking." At some point, he administered a Horizontal Gaze Nystagmus test. He testified that he told Deputy Chief Kelly that the defendant's eyes were "watery." He also testified that when he drew close to her, he could smell alcohol.

Deputy Chief Kelly relayed information he received from Officer Weeks and Sergeant Daly to Detective Bilodeau, who used it to draft an

application for a search warrant. Detective Bilodeau presented the application to Justice Taube, who issued it at 1:15 a.m. Thereafter, hospital staff drew two more blood samples at 1:55 a.m. and 2:55 a.m., respectively.

Before trial, the defendant moved to suppress all four blood samples. The court suppressed only the first blood sample. The court ruled that the second blood sample fell within the exigent circumstances exception to the warrant requirement, and not the consent exception. As for the third and fourth blood samples, which were obtained pursuant to the search warrant, the court found that although the affidavit supporting the warrant contained a material misrepresentation, the misrepresentation was not recklessly or intentionally made.

*I. Motion to Suppress*

The defendant first argues that the trial court erroneously denied her motion to suppress the second, third and fourth blood samples. When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. *State v. MacElman*, 149 N.H. 795, 797 (2003). Our review of the trial court's legal conclusions, however, is *de novo*. *Id.*

The defendant argues that suppression was warranted because the police obtained the blood samples in violation of Part I, Article 19 of the State Constitution. We confine our analysis to the State Constitution because the defendant makes no federal constitutional claim. *See State v. McKean*, 147 N.H. 198, 199-200 (2001). We rely upon federal cases only to aid our analysis. *See State v. Ball*, 124 N.H. 226, 233 (1983).

*A. Second Blood Sample*

The second blood sample was taken after the police arrested the defendant, but before they obtained a search warrant. A warrantless search is *per se* unreasonable under our State Constitution unless it falls within the narrow confines of a judicially crafted exception. *See* N.H. CONST. pt. I, art. 19; *MacElman*, 149 N.H. at 797. The State bears the burden of proving by a preponderance of the evidence that a search falls within one of these exceptions. *State v. D'Amour*, 150 N.H. 122, 125 (2003).

"The warrantless taking of blood from a person under arrest without [her] consent is undoubtedly constitutional, and many cases have so held." *State v. Berry*, 121 N.H. 324, 327 (1981). To be constitutional, the exigent circumstances exception to the warrant requirement must apply. *See State v. Wong*, 125 N.H. 610, 628 (1984) (decided under federal law). This exception has two elements: probable cause and exigent circumstances. *MacElman*, 149 N.H. at 797.

■ Probable cause is judged by an objective standard. *See State v. Canelo*, 139 N.H. 376, 380 (1995). The test is whether a person of "ordinary caution would be justified in believing that what is sought will be found in the place to be searched and that what is sought, if not contraband or fruits or implements of a crime, will aid in a particular apprehension or conviction." *Id.* (quotation and ellipsis omitted). In the context of taking a blood sample in connection with an arrest for driving while under the influence, there must be probable cause to believe that the tests will show intoxication. *Cf. Schmerber v. California*, 384 U.S. 757, 768-72 (1966) (interpreting Federal Constitution).

Exigent circumstances exist when the delay caused by obtaining a search warrant would create a substantial threat of imminent danger to life or public safety or likelihood that evidence will be destroyed. *See State v. Santana*, 133 N.H. 798, 803 (1991). Exigent circumstances "refer to those situations in which law enforcement agents will be unable or unlikely to effectuate an arrest, search, or seizure, for which probable cause exists, unless they act swiftly and, without seeking prior judicial authorization." *State v. Graca*, 142 N.H. 670, 673 (1988) (quotation omitted). Whether exigent circumstances exist is judged by the totality of the circumstances. *Santana*, 133 N.H. at 804. It is largely a question of fact for the trial court. *Graca*, 142 N.H. at 673. We will not disturb the trial court's finding of exigent circumstances unless it is clearly erroneous. *See id.*

■ The record demonstrates that Officer Weeks observed the defendant behaving erratically while at the hospital and that her speech was thick-tongued and slurred. He also smelled alcohol on her breath. Based upon this testimony, the trial court did not err by concluding that the police had probable cause to believe that testing the defendant's blood would show that she was intoxicated at the time of the accident.

■ The trial court found that there were exigent circumstances because of the nature of blood alcohol evidence and the delay inherent in obtaining a search warrant at night. We have previously taken judicial notice "of the fact that alcohol is metabolized or chemically changed by blood so as to render blood alcohol content diminished or undetectable with the passage of time." *Wong*, 125 N.H. at 629; *see State v. Schneider*, 124 N.H. 242, 245 (1983). "[A]ny significant delay in taking a blood sample may deprive the State of reliable evidence of a defendant's condition at the time he or she drove an automobile." *Wong*, 125 N.H. at 629; *see State v. Leary*, 133 N.H. 46, 49 (1990). Moreover, "[i]t is common knowledge that a[] . . . warrant, like any legal document, is considerably more difficult to obtain at night than during working hours." *Schneider*, 124 N.H. at 246; *see Wong*, 125

N.H. at 630. Accordingly, the trial court did not err by concluding that the State met its burden of showing exigent circumstances given that the accident occurred in the late evening, when obtaining a warrant is more difficult, and "the established fact of the metabolization of blood alcohol content." *Wong*, 125 N.H. at 630.

Because we affirm the trial court's ruling that taking the second blood sample was justified by probable cause and exigent circumstances, we need not reach the defendant's argument that the New Hampshire Implied Consent Statute is unconstitutional as applied to her because it permitted the police to obtain the second blood sample based solely upon probable cause. *See* RSA 265:84 (Supp. 2003).

### B. Third and Fourth Blood Samples

The third and fourth blood samples were obtained after the police procured a search warrant. The defendant argues that the trial court should have suppressed these blood samples because the affidavit in support of the search warrant was fatally defective.

The affidavit alleged that the defendant was the operator of a vehicle that police found on its passenger side in the southbound travel lane of Bay Road. It alleged that the defendant was found leaning over the other accident victim saying: "I don't know what happened. Mom, I am sorry about this." The other accident victim was trapped in the vehicle. The affidavit alleged that the other victim was initially diagnosed with "massive internal injuries" and that her condition was "critical."

The affidavit further alleged that Officer Weeks interviewed the defendant at the hospital. According to the affidavit, Officer Weeks "detected an odor of an alcoholic beverage emitting from her breath and person" and noticed that the defendant's "eyes were red and glassy" and that her behavior was "erratic." The affidavit alleged that Officer Weeks had arrested the defendant for aggravated driving while intoxicated, based upon his opinion that she was "under the influence of an intoxicating beverage." *See* RSA 265:82-a. The affidavit asserted that there was probable cause to believe that the defendant's blood might reveal that she was intoxicated while driving. Accordingly, the affiant sought a warrant for two additional blood samples from her.

The defendant first argues the affidavit's reference to her "red and glassy" eyes was a material misrepresentation of fact that was recklessly made, and therefore the evidence derived from the warrant should have been suppressed. *See State v. Valenzuela*, 130 N.H. 175, 191 (1987), cert. denied, 485 U.S. 1008 (1988). Whether an affidavit contains a misrepresentation and whether the misrepresentation was material are

questions of law, which this court decides *de novo*. *See State v. Grimshaw*, 128 N.H. 431, 435 (1986). Whether the misrepresentation was recklessly or intentionally made is a question of fact. *State v. Doyle*, 126 N.H. 153, 156 (1985). We will not overturn the trial court's finding on this question unless it is unreasonable or unsupported by the evidence. *Id.*

The parties agree, and the trial court found, that the affidavit's reference to the defendant's "red and glassy eyes" was a misrepresentation. The court ruled that this misrepresentation was material, but was not recklessly or intentionally made. The trial court's ruling of materiality is not disputed on appeal. We hold that the evidence supports the trial court's finding that the misrepresentation was neither reckless nor intentional.

■ "The appropriate focus in attacking a facially valid warrant on the ground that it contains misrepresentations is whether it contains misrepresentations made by the *affiant*, the police officer." *State v. Jaroma*, 137 N.H. 143, 147 (1993) (quotation omitted). A misrepresentation is reckless when the affiant had no reasonable ground to believe the statement to be true. *State v. Spero*, 117 N.H. 199, 205 (1977). The evidence supports the trial court's conclusion that Detective Bilodeau had reasonable grounds to believe that the defendant had red and glassy eyes. Detective Bilodeau drafted the affidavit based upon information he received from Deputy Chief Kelly about the personal observations of Officer Weeks and Sergeant Daly. The trial court did not err by finding that this information, concerning the personal observations of fellow police officers, gave Detective Bilodeau a reasonable basis to believe that the defendant had red and glassy eyes. *See Jaroma*, 137 N.H. at 148 (police officer can reasonably rely upon information provided by other officer). Accordingly, the defendant was not entitled to any relief. *See Valenzuela*, 130 N.H. at 191; *State v. Carroll*, 131 N.H. 179, 191 (1988).

■ The defendant next argues that the affidavit failed to establish probable cause because it failed to allege that she caused the accident. Assuming, without deciding, that this was a necessary allegation, we agree with the trial court that the affidavit contained sufficient information from which a reasonable and prudent person could conclude that it was more probable than not that the defendant caused the accident.

■ The defendant also contends that the affidavit was defective because it did not allege that the police had obtained two blood samples before seeking the warrant. We again assume, without deciding, that such an allegation was necessary. We agree with the trial court that because the

affidavit sought "[t]wo additional blood samples," it sufficiently alerted the issuing justice that the police already had blood samples from the defendant.

Additionally, for the first time on appeal, the defendant asserts that the affidavit was defective because it improperly alleged that Officer Weeks opined that the defendant was under the influence of an intoxicating beverage. Because the defendant did not make this assertion before the trial court, she has not preserved the issue for our review on appeal. *See State v. Blackmer*, 149 N.H. 47, 48 (2003). Accordingly, we decline to consider it. *See id.*

*II. Sentence*

We turn now to the defendant's argument that the trial court impermissibly corrected an error when it sentenced her to twelve months imprisonment, with three months deferred.

The trial court initially sentenced the defendant on April 14, 2003. The court sentenced her on the negligent homicide charge to twelve months imprisonment, stand committed, with "[a]ll but three months of the sentence . . . deferred" for three years. On the aggravated driving while intoxicated charge, the court sentenced her to a consecutive suspended sentence. The court granted the defendant's motion to stay imposition of the sentence and for bail pending appeal.

Two hours after the hearing, the court noticed that it had erroneously imposed a three-month sentence on the negligent homicide charge, instead of a nine-month sentence. The court directed its clerk to notify counsel of the error. The clerk did so. That day, the court made the following order:

> At 11:00 a.m. on April 14, 2003, the Court conducted a sentencing hearing in the above-captioned case. By scrivener's error, the Court wrote "all but 3 months deferred" when it intended to write "3 months deferred" on the sentencing order. As a result of the scrivener's error, the Court also orally read the sentencing form incorrectly.
>
> The Court discovered its error at approximately 1:00 p.m. and it directed the clerk to contact counsel to notify them of the error.
>
> It was the intent of the Court at the time of sentencing to impose a 9 month committed sentence. Accordingly, the clerk shall schedule[] a hearing so that the court may correct the record.

The court held a hearing to correct the record on May 2, 2003. The court explained that its intention "at all times was to impose a nine month committed sentence." As the court stated:

> It is my view that while the defendant is certainly entitled to finality and certainty at the time of sentencing, which means once she's been properly sentenced, the court cannot reconsider, reassess, review its reasoning, or change its sentence after further reflection[,] . . . in this case, no such reflection occurred.
>
> The defendant is not entitled to the benefit of a court's mistake when the intention of the court at all times was to impose a nine month committed sentence.

Defense counsel conceded that this was the court's intent at the time of the first sentencing hearing: "And for this record we do not dispute anything the court has said relative to what the court's intent was at the time of the proceeding." After hearing arguments from counsel, the court amended the defendant's sentence to correct its error and sentenced her to twelve months imprisonment on the negligent homicide charge, with three months deferred, for a period of three years.

Because the defendant does not argue otherwise, we assume, without deciding, that the trial court had the inherent authority to correct this kind of error. *See Doyle v. O'Dowd*, 85 N.H. 402 (1932) (court has inherent authority to correct error inadvertently made in its record of sentence); *State v. Thompson*, 110 N.H. 190, 191-92 (1970) (court has inherent power to review sentence, modify it or order that it be served before defendant has been delivered to executive department for service of sentence); *cf.* FED. R. CRIM. P. 35(a) (codifying common law rule that sentencing court may correct sentence "imposed as a result of arithmetical, technical, or other clear error").

The sole issue for our review is whether the trial court violated the defendant's State constitutional right to due process by correcting its error. *See* N.H. CONST. pt. I, art. 15. Because she does not argue that the court violated her rights under the Federal Due Process Clause, we confine our analysis to the State Constitution. *See* U.S. CONST. amends. V, XIV.

 Due process requires a sentencing court to clearly communicate to the defendant the exact nature of the sentence as well as the extent to which the court retains discretion to modify it or impose it at a later date. *State v. Budgett*, 146 N.H. 135, 137 (2001). Due process thus imposes an outer limit upon the court's ability to correct a sentence after pronouncing

it. *See Grajczyk v. State*, 666 N.W.2d 472, 476 (S.D. 2003) (due process violation will be found only in extreme cases). As we have stated in another context, "at some point the sentencing process must come to an end." *State v. Rau*, 129 N.H. 126, 131 (1987). Under the circumstances of this case, we hold that this outer limit was not exceeded. *Cf. Dewitt v. Ventetoulo*, 6 F.3d 32, 34-36 (1st Cir. 1993) (interpreting Federal Due Process Clause); *Hanson v. State*, 718 A.2d 572, 573-74 (Me. 1998) (same).

■ To determine whether the amended sentence offends due process, courts in other jurisdictions have examined factors such as: (1) the lapse of time between the mistake and the attempted increase in sentence; (2) whether the defendant contributed to the mistake; (3) the reasonableness of the defendant's intervening expectations; (4) the prejudice to the defendant from the change; and (5) the diligence of the State in seeking the change. *DeWitt*, 6 F.3d at 35; *Hanson*, 718 A.2d at 573-74. We find these factors instructive.

In this case, the time between the court's error and its attempted correction was short. The court notified the parties of its error and original sentencing intent approximately two hours after sentencing. That day, the court ordered a hearing to correct its error, which was held approximately two weeks later. *See DeWitt*, 6 F.3d at 35 (federal due process guarantee violated when, among other factors, there was multi-year period between suspension of sentence and its reimposition). Moreover, the defendant was not prejudiced by the lapse of time between the first and second sentencing hearing because after the first hearing, the court stayed the sentence pending appeal and the defendant was free on bail. *Cf. Baker v. Barbo*, 177 F.3d 149, 157-59 (3d Cir. 1999) (although power of sentencing court to correct invalid sentence must be subject to some temporal limit, limit not reached where defendant appealed conviction and State cross-appealed sentence).

Further, the court's error was clerical in nature and was not the product of judicial reasoning or reflection. The court read from a sentencing form that mistakenly stated that "all but three months" of the defendant's twelve-month sentence was to be deferred, instead of "three months" to be deferred. The defendant does not dispute this characterization of the court's error on appeal. The record shows, and the parties do not dispute, that the court always intended to sentence the defendant to nine months stand committed, not three months. Thus, when the court corrected its error, it was merely conforming the record to reflect its original intent.

*Cf. United States v. Guevremont,* 829 F.2d 423, 427-29 (3d Cir. 1987) (where increase of sentence results from correction of sentence to conform to original intent of sentencing judge, Federal Double Jeopardy Clause is not violated).

Under all of these circumstances, we hold that the defendant's interest in finality is outweighed by the State's interest in correcting this clerical error. *See DeWitt,* 6 F.3d at 35. We conclude, therefore, that the trial court did not violate the defendant's State due process rights by amending her sentence to correct its clerical error.

*Affirmed.*

DALIANIS and DUGGAN, JJ., concurred.